## BABE BEARD *v.* UNITED STATES.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF ARKANSAS.

No. 842. Submitted March 18, 1895. — Decided May 27, 1895.

A man assailed on his own grounds, without provocation, by a person armed with a deadly weapon and apparently seeking his life, is not obliged to retreat, but may stand his ground and defend himself with such means as are within his control; and so long as there is no intent on his part to kill his antagonist, and no purpose of doing anything beyond what is necessary to save his own life, is not guilty of murder or manslaughter if death results to his antagonist from a blow given him under such circumstances.

THE case is stated in the opinion.

*Mr. John H. Rogers* and *Mr. Ira D. Oglesby* for plaintiff in error.

*Mr. Assistant Attorney General Dickinson* for the United States.

MR. JUSTICE HARLAN delivered the opinion of the court.

The plaintiff in error, a white man and not an Indian, was indicted in the Circuit Court of the United States for the

Western District of Arkansas for the crime of having killed and murdered in the Indian country, and within that District, one Will Jones, also a white person and not an Indian.

He was found guilty of manslaughter and, a motion for a new trial having been overruled, it was adjudged that he be imprisoned in Kings County Penitentiary, at Brooklyn, New York, for the term of eight years, and pay to the United States a fine of five hundred dollars.

The record contains a bill of exceptions embodying all the evidence, as well as the charge of the court to the jury, and the requests of the accused for instructions. To certain parts of the charge, and to the action of the court in refusing instructions asked by the defendant, exceptions were duly taken.

The principal question in the case arises out of those parts of the charge in which the court instructed the jury as to the principles of the law of self-defence.

There was evidence before the jury tending to establish the following facts:

An angry dispute arose between Beard and three brothers by the name of Jones — Will Jones, John Jones, and Edward Jones — in reference to a cow which a few years before that time, and just after the death of his mother, was set apart to Edward. The children being without any means for their support were distributed among their relatives, Edward being assigned to Beard, whose wife was a sister of Mrs. Jones. Beard took him into his family upon the condition that he should have the right to control him and the cow as if the lad were one of his own children, and the cow his own property. At the time Edward went to live with Beard he was only eight or nine years of age, poorly clad, and not in good physical condition.

After remaining some years with his aunt and uncle, Edward Jones left the Beard house, and determined, with the aid of his older brothers, to take the cow with him, each of them knowing that the accused objected to that being done.

The Jones brothers, one of them taking a shot-gun with him, went upon the premises of the accused for the purpose of taking the cow away, whether Beard consented or not.

But they were prevented by the accused from accomplishing that object, and he warned them not to come to his place again for such a purpose, informing them that if Edward Jones was entitled to the possession of the cow, he could have it, provided his claim was successfully asserted through legal proceedings instituted by or in his behalf.

Will Jones, the oldest of the brothers, and about 20 or 21 years of age, publicly avowed his intention to get the cow away from the Beard farm or kill Beard, and of that threat the latter was informed on the day preceding that on which the fatal difficulty in question occurred.

In the afternoon of the day on which the Jones brothers were warned by Beard not again to come upon his premises for the cow unless attended by an officer of the law, and in defiance of that warning, they again went to his farm, in his absence — one of them, the deceased, being armed with a concealed deadly weapon — and attempted to take the cow away, but were prevented from doing so by Mrs. Beard, who drove it back into the lot from which it was being taken.

While the Jones brothers were on the defendant's premises in the afternoon, for the purpose of taking the cow away, Beard returned to his home from a town near by — having with him a shot-gun that he was in the habit of carrying, when absent from home — and went at once from his dwelling into the lot, called the orchard lot, a distance of about 50 or 60 yards from his house and near to that part of an adjoining field or lot where the cow was, and in which the Jones brothers and Mrs. Beard were at the time of the difficulty.

Beard ordered the Jones brothers to leave his premises. They refused to leave. Thereupon Will Jones, who was on the opposite side of the orchard fence, ten or fifteen yards only from Beard, moved towards the latter with an angry manner and in a brisk walk, having his left hand (he being, as Beard knew, left-handed) in the left pocket of his trousers. When he got within five or six steps of Beard, the latter warned him to stop, but he did not do so. As he approached nearer the accused asked him what he intended to do, and he replied: "Damn you, I will show you," at the same time making a

movement with his left hand as if to draw a pistol from his pocket; whereupon the accused struck him over the head with his gun and knocked him down.

"Believing," the defendant testified, "from his demonstrations just mentioned that he intended to shoot me, I struck him over the head with my gun to prevent him killing me. As soon as I struck him his brother John, who was a few steps behind him, started towards me with his hands in his pocket. Believing that he intended to take part in the difficulty and was also armed, I struck him and he stopped. I then at once jumped over the fence, caught Will Jones by the lapel of the coat, turned him rather to one side, and pulled his left hand out of his pocket. He had a pistol, which I found in his pocket, grasped in his left hand, and I pulled his pistol and his left hand out together. My purpose in doing this was to disarm him, to prevent him from shooting me, as I did not know how badly he was hurt. My gun was loaded, having ten cartridges in the magazine. I could have shot him, but did not want to kill him, believing that I could knock him down with the gun and disarm him and protect myself without shooting him. After getting his pistol, John Jones said something to me about killing him, to which I replied that I had not killed him and did not try to do so, for if I had I could have shot him. He said my gun was not loaded; thereupon I shot the gun in the air to show him that it was loaded."

Dr. Howard Hunt, a witness on behalf of the government, testified that he called to see Will Jones soon after he was hurt, and found him in a serious condition; that he died from the effects of a wound given by the defendant; that the wound was across the head, rather on the right side, the skull being crushed by the blow. He saw the defendant soon after dressing the wound, and told him that the deceased's condition was serious, and that he, the witness, was sorry the occurrence had happened. The witness suggested to the accused that perhaps he had better get out of the way. The latter replied that he was sorry that it had happened, but that he acted in self-defence and would not go away. Beard seemed

a· little offended at the suggestion that he should run off, and observed to the witness that the latter could not scare him, for he was perfectly justified in what he did. This witness further testified that he had known the defendant four or five years, was well acquainted in the neighborhood in which he lived, and knew his general reputation, which was that of· a peaceable, law-abiding man.

The account we have given of the difficulty is not in harmony, in every particular, with the testimony of some of the witnesses, but it is sustained by what the accused and others testified to at the trial; so that, if the jury had found the facts to be as we have detailed them, it could not have been said that their finding was contrary to the evidence. At any rate, it was the duty of· the court to tell the jury by what principles of law they should be guided, in the event they found the facts to be as stated by the accused.

Assuming then that the facts were as we have represented them to be, we are to inquire whether the court erred in its charge to the jury. In the view we take of the case, it will be necessary to refer to those parts only of the charge relating to the law· of self-defence;.

The court stated at considerable length the general rules that determine whether the killing of a human being is murder or manslaughter, and, among other things, said to the jury : "If these boys, or young men, or whatever you may consider them, went down there, and they were there unlawfully — if they had no right to go there — you naturally inquire whether the defendant was placed in such a situation as that he could kill. for that reason. Of course, he could not. He could not kill them because they were upon his place. . . . And if these young men were there in the act of attempting the larceny of this cow and calf and the defendant killed because of that, because his mind was inflamed for the reason that they were seeking to do an act of· that kind, that is manslaughter; that is all it is ; there is nothing else in it ; that is considered so far provocative as that it reduces the grade of the crime to manslaughter and no farther. If they had no intent to commit a larceny; if it was a bare, naked trespass; if they were there

under a claim of right to get this cow, though they may not have had any right to it, but in good faith they were exercising their claim of that kind, and Will Jones was killed by the defendant for that reason, that would be murder, because you cannot kill a man for bare trespass — you cannot take his life for a bare trespass — and say the act is mitigated."

After restating the proposition that a man cannot take life because of mere fear on his part, or in order that he may prevent the commission of a bare trespass, the court proceeded: "Now, a word further upon the proposition that I have already adverted to as to what was his duty at the time. If that danger was real, coming from the hands of Will Jones, or it was apparent as coming from his hands and as affecting this defendant by some overt act at the time, was the defendant called upon to avoid that danger *by getting out of the way* of it if he could? The court says he was. The court tells you that he was. There is but one place where he need not retreat any further, where he need not go away from the danger, and that is in his dwelling-house. He may be upon his own premises, and if a man, while so situated and upon his own premises, can do that which would reasonably put aside the danger short of taking life, if he can do that, I say, he is called upon to do so by retreating, *by getting out of the way* if he can, by avoiding a conflict that may be about to come upon him, and the law says that he must do so, and *the fact that he is standing upon his own premises* away from his own dwelling-house does not take away from him the exercise of the duty of avoiding the danger if he can with a due regard to his own safety *by getting away from there* or by resorting to some other means of less violence than those resorted to. Now, the rule as applicable to a man of that kind upon his own premises, upon his own property, *but outside of his dwelling-house,* is as I have just stated." Again: "You are to bear in mind that the first proposition of the law of self-defence was that the defendant in this case was in the lawful pursuit of his business — that is to say, he was doing what he had a right to do at the time. If he was not he deprives himself of the right of self-defence, and, no matter what his adversary may do, if he

by his own conduct creates certain conditions by his own wrongful conduct he cannot take advantage of such conditions created by his own wrongful act or acts. . . . Again, going to the place where the person slain is with a deadly weapon *for the purpose of provoking a difficulty or with the intent of having an affray.* Now, if a man does that, he is in the wrong, and he is cut off from the right of self-defence, no matter what his adversary may do, because the law says in the very language of these propositions relating to the law of self-defence that he must avoid taking life if he can with due regard to his own safety. Whenever he can do that he must do it; therefore, if he has an adversary and he knows that there is a bitter feeling, that there is a state of feeling that may precipitate a deadly conflict between himself and his adversary, while he has a right to pursue his usual daily avocations that are right and proper, going about his business, to go and do what is necessary to be done in that way, yet if he knows that condition I have named to exist and he goes to the place where the slain person is with a deadly weapon for the purpose of provoking a difficulty or with the intent of having an affray if it comes up, he is there to have it, and he acts for that purpose, the law says there is no self-defence for him. . . . If he went to the place where that young man was, armed with a deadly weapon, even if it was upon his own premises, with the purpose of provoking a difficulty with him, in which he might use that deadly weapon, or of having a deadly affray with him, it does not make any difference what was done by the young man, there is no self-defence for the defendant. The law of self-defence does not apply to a case of that kind, because he cannot be the creator of a wrong, of a wrong state of case, and then act upon it. Now, if either one of these conditions exist, I say, the law of self-defence does not apply in this case."

Later in the charge, the court recurred to the inquiry as to what the law demanded of Beard before striking the deceased with his gun, and said : "If at the time of this killing it be true that the deceased was doing an act of apparent or real deadly violence and that state of case existed, and yet that

the defendant at the time could have avoided the necessity of taking his life by the exercise of any other reasonable means and he did not do that, because he did not exercise other reasonable means that would have with equal certainty saved his life, but resorted to this dernier remedy, under those facts and circumstances the law says he is guilty of manslaughter. Now, let us see what that requires. It requires, first, that the proof must show that Will Jones was doing an act of violence or about to do it, or apparently doing it or about to do it, but that it was an act that the defendant could have escaped from by doing something else other than taking the life of Jones, *by getting out of the way of that danger*, as he was called upon to do, as I have already told you, *for he could not stand there as he could stand in his own dwelling-house*, and he must have reasonably sought to avoid that danger before he took the life of Jones, and if he did not do that, if you find that to be Jones' position from this testimony, and he could have done so, but did not do it, the defendant would be guilty of manslaughter when he took the life of Jones, because in that kind of a case the law says that the conduct of Jones would be so provocative as to reduce the grade of crime; yet, at the same time, it was a state of case that the defendant could have avoided without taking his life, and because he did not do it, he is guilty of the crime of manslaughter." Further: "If it be true that Will Jones at the time he was killed was exercising deadly violence, or about to do so, or apparently exercising it, or apparently about to do so, and the defendant could have paralyzed the effect of that violence without taking the life of Jones, but he did not do it, but resorted to this deadly violence when he could have protected his own life without resorting to that dernier remedy — if that be the state of case, the law says he is guilty of manslaughter, because he is doing that which he had no right to do. This great law of self-defence commands him at all times to do that which he can do under the circumstances, to wit, exercise reasonable care to avoid the danger *by getting out of the way of it*, or by exercising less violence than that which will produce death and yet will be equally effective to secure his own life. If either of

these propositions exist, and they must exist to the extent I have defined to you, and the defendant took the life of Jones under these circumstances, the defendant would be guilty of manslaughter."

We are of opinion that the charge of the court to the jury was objectionable, in point of law, on several grounds.

There was no evidence tending to show that Beard went from his dwelling-house to the orchard fence *for the purpose* of provoking a difficulty, or with *the intent* of having an affray with the Jones brothers or with either of them. On the contrary, from the outset of the dispute, he evinced a purpose to avoid a difficulty or an affray. He expressed his willingness to abide by the law in respect to his right to retain the cow in his possession. He warned the Jones brothers, as he had a legal right to do, against coming upon his premises for the purpose of taking the cow away. They disregarded this warning, and determined to take the law into their own hands, whatever might be the consequences of such a course. Nevertheless, when Beard came to where they were, near the orchard fence, he did nothing to provoke a difficulty, and prior to the moment when he struck Will Jones with his gun he made no demonstration that indicated any desire whatever on his part to engage in an affray or to have an angry controversy. He only commanded them, as he had the legal right to do, to leave his premises. He neither used, nor threatened to use, force against them.

The court several times, in its charge, raised or suggested the inquiry whether Beard was in the lawful pursuit of his business, that is, doing what he had a right to do, when, after returning home in the afternoon, he went from his dwelling-house to a part of his premises near the orchard fence, just outside of which his wife and the Jones brothers were engaged in a dispute — the former endeavoring to prevent the cow from being taken away, the latter trying to drive it off the premises. Was he not doing what he had the legal right to do, when, keeping within his own premises and near his dwelling, he joined his wife who was in dispute with others, one of whom, as he had been informed, had already threatened to take

the cow away or kill him? We have no hesitation in answering this question in the affirmative.

The court also said: "The use of provoking language, or, it seems, resorting to any other device in order to get another to commence an assault so as to have a pretext for taking his life, agreeing with another to fight him with a deadly weapon, either one of these cases, if they exist as the facts in this case, puts the case in such an attitude that there is no self-defence in it." We are at a loss to understand why any such hypothetical cases were put before the jury. The jury must have supposed that, in the opinion of the court, there was evidence showing that Beard sought an opportunity to do physical harm to the Jones boys, or to some one of them. There was not the slightest foundation in the evidence for the intimation that Beard had used provoking language or resorted to any device in order to have a pretext to take the life of either of the brothers. Much less was there any reason to believe that there was an agreement to fight with deadly weapons.

But the court below committed an error of a more serious character when it told the jury, as in effect it did by different forms of expression, that if the accused could have saved his own life and avoided taking the life of Will Jones by retreating from and getting out of the way of the latter as he advanced upon him, the law made it his duty to do so; and if he did not, when it was in his power to do so without putting his own life or body in imminent peril, he was guilty of manslaughter. The court seemed to think if the deceased had advanced upon the accused while the latter was in his dwelling-house and under such circumstances as indicated the intention of the former to take life or inflict great bodily injury, and if, without retreating, the accused had taken the life of his assailant, having at the time reasonable grounds to believe, and in good faith believing, that his own life would be taken or great bodily harm done him unless he killed the accused, the case would have been one of justifiable homicide. To that proposition we give our entire assent. But we cannot agree that the accused was under any greater obligation, when on his own premises, near his dwelling-house, to retreat or run away

from his assailant, than he would have been if attacked within his dwelling-house. The accused being where he had a right to be, on his own premises, constituting a part of his residence and home, at the time the deceased approached him in a threatening manner, and not having by language or by conduct provoked the deceased to assault him, the question for the jury was whether, without fleeing from his adversary, he had, at the moment he struck the deceased, reasonable grounds to believe, and in good faith believed, that he could not save his life or protect himself from great bodily harm except by doing what he did, namely, strike the deceased with his gun, and thus prevent his further advance upon him. Even if the jury had been prepared to answer this question in the affirmative — and if it had been so answered the defendant should have been acquitted — they were instructed that the accused could not properly be acquitted on the ground of self-defence if they believed that, by retreating from his adversary, by "getting out of the way," he could have avoided taking life. We cannot give our assent to this doctrine.

The application of the doctrine of "retreating to the wall" was carefully examined by the Supreme Court of Ohio in *Erwin* v. *State*, 29 Ohio St. 186, 193, 199. That was an indictment for murder, the defendant being found guilty. The trial court charged the jury that if the defendant was in the lawful pursuit of his business at the time the fatal shot was fired, and was attacked by the deceased under circumstances denoting an intention to take life or to do great bodily harm, he could lawfully kill his assailant provided he used all means "*in his power*" otherwise to save his own life or prevent the intended harm, "such as retreating as far as he can, or disabling his adversary, without killing him, *if it be in his power;*" that if the attack was so sudden, fierce, and violent that a retreat would not diminish but increase the defendant's danger, he might kill his adversary without retreating; and further, that if from the character of the attack there was reasonable ground for defendant to believe, and he did honestly believe, that his life was about to be taken, or he was to suffer great bodily harm, and that he believed honestly that he would be in equal danger

by retreating, then, if he took the life of the assailant, he was excused. Of this charge the accused complained.

Upon a full review of the authorities and looking to the principles of the common law, as expounded by writers and courts of high authority, the Supreme Court of Ohio held that the charge was erroneous, saying: "It is true that all authorities agree that the taking of life in defence of one's person cannot be either justified or excused, except on the ground of *necessity;* and that such necessity must be imminent at the time; and they also agree that no man can avail himself of such necessity if he brings it upon himself. The question then is simply this: Does the law hold a man who is violently and feloniously assaulted responsible for having brought such necessity upon himself on the sole ground that he failed to fly from his assailant when he might safely have done so? The law, out of tenderness for human life and the frailties of human nature, will not permit the taking of it to repel a mere trespass, or even to save life where the assault is provoked; but a true man who is without fault is not obliged to fly from an assailant, who by violence or surprise maliciously seeks to take his life or do him enormous bodily harm. Now, under the charge below, notwithstanding the defendant may have been without fault, and so assaulted, with the necessity of taking life to save his own upon him; still the jury could not have acquitted if they found he had failed to do all in his power otherwise to save his own life, or prevent the intended harm, as retreating as far as he could, etc. In this case we think the law was not correctly stated."

In *Runyan* v. *State*, 57 Indiana, 80, 84, which was an indictment for murder, and where the instructions of the trial court involved the present question, the court said: "A very brief examination of the American authorities makes it evident .at the ancient doctrine, as to the duty of a person assailed to retreat as far as he can, before he is justified in repelling force by force, has been greatly modified in this country, and has with us a much narrower application than formerly. Indeed, the tendency of the American mind seems to be very strongly against the enforcement of any rule which

requires a person to flee when assailed, to avoid chastisement or even to save human life, and that tendency is well illustrated by the recent decisions of our courts, bearing on the general subject of the right of self-defence. The weight of modern authority, in our judgment, establishes the doctrine that, when a person, being without fault and in a place where he has a right to be, is violently assaulted, he may, without retreating, repel force by force, and if, in the reasonable exercise of his right of self-defence, his assailant is killed, he is justifiable. . . . It seems to us that the real question in the case, when it was given to the jury, was, was the defendant, under all the circumstances, justified in the use of a deadly weapon in repelling the assault of the deceased? We mean by this, did the defendant have reason to believe, and did he in fact believe, that what he did was necessary for the safety of his own life or to protect him from great bodily harm? On that question the law is simple and easy of solution, as has been already seen from the authorities cited above."

In East's Pleas of the Crown, the author, considering what sort of an attack it was lawful and justifiable to resist, even by the death of the assailant, says: "A man may repel force by force, in defence of his person, habitation or property, against one who manifestly intends or endeavors, *by violence or surprise*, to commit a known felony, such as murder, rape, robbery, arson, burglary, and the like, upon either. In these cases he is not obliged *to retreat*, but may pursue his adversary until he has secured himself from all danger; and if he kill him in so doing it is called justifiable self-defence; as, on the other hand, the killing by such felon of any person so lawfully defending himself will be murder. But a bare fear of any of these offences, however well grounded, as that another lies in wait to take away the party's life, unaccompanied with any overt act indicative of such an intention, will not warrant in killing that other by way of prevention. There must be an actual danger at the time." p. 271. So in Foster's Crown Cases : "In the case of justifiable self-defence, the injured party may repel force with force in defence of his person,

habitation, or property, against one who manifestly intendeth and endeavoreth, with violence or surprise, to commit a known felony upon either. In these cases he is not obliged to retreat, but may pursue his adversary till he findeth himself out of danger, and if, in a conflict between them, he happeneth to kill, such killing is justifiable." c. 3, p. 273.

In Bishop's New Criminal Law, the author, after observing that cases of mere assault, and of mutual quarrel, where the attacking party has not the purpose of murder in his heart, are those to which is applied the doctrine of the books, that one cannot justify the killing of another, though apparently in self-defence, unless he retreat to the wall or other interposing obstacle before resorting to this extreme right, says that "where an attack is made with murderous intent, the person attacked is under no duty to fly; he may stand his ground, and if need be, kill his adversary. *And it is the same where the attack is with a deadly weapon*, for in this case the person attacked may well assume that the other intends murder, whether he does in fact or not." Vol. 1, § 850. The rule is thus expressed by Wharton: "A man may repel force by force in the defence of his person, habitation, or property, against any one or many who manifestly intend and endeavor by violence or surprise to commit a known felony on either. In such case he is not compelled to retreat, but may pursue his adversary until he finds himself out of danger, and if in the conflict between them he happen to kill him, such killing is justifiable." 2 Wharton on Crim. Law, § 1019, 7th rev. ed. Phila. 1874. See also *Gallagher* v. *State*, 3 Minnesota, 270, 273; *Pond* v. *People*, 8 Michigan, 150, 177; *State* v. *Dixon*, 75 N. C. 275, 295; *State* v. *Sherman*, 16 R. I. 631; *Fields* v. *State*, 32 N. E. Rep. 780; *Eversole* v. *Commonwealth*, 26 S. W. Rep. 816; *Haynes* v. *State*, 17 Georgia, 465, 483; *Long* v. *State*, 52 Mississippi, 23, 35; *Tweedy* v. *State*, 5 Iowa, 433; *Baker* v. *Commonwealth*, 19 S. W. Rep. 975; *Tingle* v. *Commonwealth*, 11 S. W. 812; 3 Rice's Ev. § 360.

In our opinion, the court below erred in holding that the accused, while on his premises, outside of his dwelling-house, was under a legal duty to get out of the way, if he could, of

his assailant, who, according to one view of the evidence, had threatened to kill the defendant, in execution of that purpose had armed himself with a deadly weapon, with that weapon concealed upon his person went to the defendant's premises, despite the warning of the latter to keep away, and by word and act indicated his purpose to attack the accused. The defendant was where he had the right to be, when the deceased advanced upon him in a threatening manner, and with a deadly weapon; and if the accused did not provoke the assault and had at the time reasonable grounds to believe and in good faith believed, that the deceased intended to take his life or do him great bodily harm, he was not obliged to retreat, nor to consider whether he could safely retreat, but was entitled to stand his ground and meet any attack made upon him with a deadly weapon, in such way and with such force as, under all the circumstances, he, at the moment, honestly believed, and had reasonable grounds to believe, was necessary to save his own life or to protect himself from great bodily injury.

As the proceedings below were not conducted in accordance with these principles, the judgment must be reversed and the cause remanded with directions to grant a new trial.

Other objections to the charge of the court are raised by the assignments of error, but as the questions which they present may not arise upon another trial, they will not be now examined.

*Judgment reversed.*