# SACRINI *v.* UNITED STATES.*

CRIMINAL LAW; HOMICIDE; SELF-DEFENSE; EVIDENCE; REPUTATION.

1. Where the defense in a homicide case was that of self-defense, and the testimony for the prosecution tended to show that the accused knocked the deceased down, struck him, and stabbed him to death, and that the accused had been seen with a knife before the night of the killing, and one was found in his overcoat pocket afterwards; and the testimony for the accused tended to show threats by the deceased; possession by the deceased of a knife immediately before the killing; a threatening approach by the deceased with an attempt to draw his knife, whereupon the accused grabbed the deceased by the right arm, pushed him back, and both fell in the northwest corner of the room; that the accused felt the knife penetrate the muscles of his right thumb, and grabbed the knife in the hands of deceased; that, so far far as he realized, he left the knife with the deceased, but that he was so scared that he did not know what he did; and the accused, in cross-examining a physician who had testified that he had removed the body of the deceased to the hospital, and had examined his wounds, asked the witness whether from the nature of the wounds, assuming that the deceased, when stabbed, was lying on his back in the northwest corner of the room, the deceased could, in the opinion of the witness, have gotten on his feet and into the position he was when the witness found him, and the trial court sustained an objection by the prosecution to the question,—it was *held* that, assuming that witness would have answered as expected by the accused, the

*Homicide—Self-defense.*—For various phases of the question of homicide in self-defense, see the following editorial notes: Self-defense in resisting officer, note to *State* v. *Durham,* 5 L.R.A. (N.S.) 1016; Right of self-defense by one who is pursued and assaulted after leaving premises which he had entered for an unlawful purpose, note to *Cox* v. *State,* 26 L.R.A. (N.S.) 621; Criminal responsibility of aggressor for accidental killing of third person by shot fired in self-defense at aggressor, note to *Com.* v. *Moore,* 2 L.R.A. (N.S.) 719; Standpoint of determination as to danger and necessity to kill in self-defense, note to *State* v. *Beckner,* 3 L.R.A. (N.S.) 535; Applicability of rule of reasonable doubt to self-defense in homicide, note to *Com.* v. *Palmer,* 19 L.R.A. (N.S.) 483; Self-defense set up by accused, who began the conflict, note to *Foutch* v. *State,* 45 L.R.A. 687; Homicide, when justifiable in self-defense, note to *Gourko* v. *United States,* 38 L. ed. U. S. 680.

evidence would have had no legal bearing upon the issue before the jury.

2. Where the accused in a homicide case offered no testimony as to his good reputation in the community in which he lived, but offered to prove by the foremen of a railroad for which he worked, that he had the reputation of being a peaceable man, but it appeared on cross-examination of the witnesses that they knew nothing of his reputation in the community in which he lived, and could only testify as to his reputation among the other workmen engaged in the same work, it was *held* that the trial court properly excluded such evidence.

3. Before anyone is justified in taking life under the apprehension that he is in danger of his own life or of serious bodily harm from the violence of another, it must appear that he had a reasonable right to believe from all the facts and circumstances presented to his mind, that he was in such danger. The test is not the actual belief of the accused, but whether a reasonably prudent person, similarly situated, would have believed that he was in such danger. (Following *Hopkins* v. *United States,* 4 App. D. C. 430.)

No. 2359. Submitted February 6, 1912. Decided March 4, 1912.

HEARING on an appeal by the accused from a judgment of conviction of the Supreme Court of the District of Columbia, sitting as a criminal court, in a prosecution for murder.

*Affirmed.*

The COURT in the opinion stated the facts as follows:

The appellant, Antonio Sacrini, was indicted for the murder of one Charles J. Chipman, found guilty of murder in the second degree, and sentenced to imprisonment for life.

The testimony tended to show that defendant and deceased had been intimate with the same woman.

On the night of December 31, 1910, defendant was in the house where the woman lived with other persons, drinking beer. Deceased came in and spoke, and asked the woman if his clothes were ready. He said, "Hello, Tony!" Tony (the defendant) said, "Hello, Charley!" Deceased said: "Tony, where is that gun I heard you had to put in my face when you

seen me ?" Defendant said: "I don't carry no gun for you. I don't carry no gun for anybody, and you haven't made any trouble for me." Deceased said: "Let's shake hands." Walked over and shook hands. Deceased went out and returned with a pint of whiskey, and afterwards, on deceased's invitation, defendant went out with him to drink. They returned after a while, deceased appearing to be quite drunk. They had some words. Deceased came back into the back room and said: "Well, Tony, you say this is your wife ?" Defendant said: "Yes, but I don't want her; you can have her if you want her." Defendant became enraged. He started, as if to go out, and came back, saying to deceased: "Do you say that to me, that you would cut my throat ?" Deceased said that he had no knife; that he was a friend of Tony, but that if Tony touched that woman he would cut his throat. Defendant then knocked deceased down. He commenced first to strike him with his fist, then reached back and took a knife to him, with which he began stabbing him. Deceased was on the floor when defendant pulled his knife, and began stabbing him. He had his hand in deceased's collar. Deceased received several stabs from which he soon died. Testimony tended to show that defendant had previously threatened to kill deceased, and that he had a revolver in his pocket when he came to the house. Defendant had been seen with a knife,—a stiletto,—but no knife was seen in his possession on that night, none was found on him when arrested, and none was found in deceased's wounds, or in the house after the killing. Defendant introduced testimony tending to show that when the body of deceased was examined at the hospital, an open pen-knife was found in his overcoat pocket. That deceased had threatened his life; that he said he had bought a good Italian knife and had a revolver. The knife had a blade 3 or 4 inches long. This was about a year and a half before. That he said he did not like to see defendant knocking about that street, and if he did he was going to kill him. Other threats were testified to, and their communication to the defendant.

Defendant testified on his own behalf in substance as fol-

lows: That he had lived in Washington about six and a half years; worked on the reservoir first, then the B. & O. Railway a little while, and then on the Pennsylvania Railroad. He had lived at 465 Armory street with Minerva Pollena, the woman at whose place the affair occurred. That deceased had told him he had been a soldier in the Philippines, and had killed a man there. Heard that deceased had stabbed a woman in Washington. That he had heard of deceased's threats to take his life. That about three weeks after he left Pollena's house, went there and found deceased in there. He cursed defendant, and said: "If you want to fight, come on. I don't care if you are bigger than I am. I will fight you and I will kill you." He put his hand in his pocket to pull a knife. Defendant said: "I didn't come over here to have no fight with you." Defendant went out. He denied threatening the life of deceased. Had seen deceased with a knife many times,—an American knife with several blades. That deceased came back from jail, where he had been confined for shooting some man at 4½ street.

Defendant, on the night of the affray, met the Pollena woman on Delaware avenue, with beer; she invited him into the house and he went in. After a while deceased came in, They spoke. Deceased asked why he had not been to the jail to see him. He felt defendant's pockets, and said: "What have you got in your pocket?" After drinking together at deceased's invitation, deceased invited him to go to the bar across the street and take a drink. While in the bar, deceased walked to the back of the bar, and came back with an open knife in his hand. Told deceased to put the knife away, and saw him put it in his right hand breeches pocket with handle down, and open blade up. Defendant suggested going out, and was followed by deceased. Defendant said he would go home, but deceased grabbed his arm, and said, "Come over with me." When they got in the house again, deceased said: "I am going to take this knife and kill you, and that woman too." Defendant went into the back room, a kitchen, and talked with the Coleman woman. Deceased came in and said: "Is Min-

erva your wife?" Defendant said that she was. Deceased was standing between the stove and the door to the front room. Defendant was on the other side of the stove. Deceased cursed defendant, saying, three times, that he would cut his throat, and advancing towards him. Defendant backed to the door leading to the hall, but was afraid to turn for fear deceased would cut him with his knife. When deceased got real close, he put his hand in his pocket in an attempt to draw the knife that he had put in his pocket. Defendant grabbed deceased by the right arm, pushed him back, and they fell in the northwest corner of the room. Defendant felt a knife penetrate the muscles of his right thumb, and grabbed the knife in the hands of deceased. He was so excited and scared that he does not know what he did; believed every minute the deceased would kill him. "I believed he was going to kill me. He said he was going to cut my throat, and he had the knife there, and I thought he was going to kill me. Yes, I believed it allright. I was scared." Defendant said that he took the knife out of his right hand; so far as he knows or realizes he left the knife with the deceased. He was so scared that he thought the deceased was going to get up, and he always had a pistol in his pocket, and he thought he was going to shoot him, and he ran away.

This testimony was in direct conflict with that of the witnesses of the government. There was testimony tending to show that upon examination the next day, defendant had a cut across the right thumb and middle finger, as if a sharp instrument had been drawn across it. Deceased weighed about 140 to 150 pounds; defendant about 182 pounds.

*Mr. W. Gwynn Gardiner* for the appellant.

*Mr. Clarence R. Wilson,* United States District Attorney, and *Mr. James M. Proctor,* Assistant, for the appellee.

Mr. Chief Justice Shepard delivered the opinion of the Court:

1. The first assignment of error is on an exception taken to the exclusion of evidence offered by the defendant. Having proved by Dr. Kilgore, the surgeon who removed the body of deceased to the Casualty Hospital, that he found the open knife in his overcoat pocket, and examined his wounds, the defendant asked him the following question: "From the nature of the wounds as you found them upon examination, first and afterwards by witnessing the character of the wounds at the autopsy, and assuming that the deceased, when stabbed, when he received these wounds, was lying on his back in the northwest corner of the room, out of which you removed him, could he, in your opinion, have gotten on his feet, and gotten into the position he was when you found him?" The court sustained an objection to the answer. Assuming that the witness would have answered as expected by the propounder of the question, we have, after careful consideration of the argument in support of the assignment, been unable to perceive any legal bearing that the evidence would have on the issues before the jury.

2. Defendant offered to prove by two witnesses that he had the reputation of being a peaceable man. It appeared that the witnesses were foremen on the railway, under whom defendant had worked. Upon cross-examination it appeared that they knew nothing of his reputation in the community in which he lived, and could only testify to it among the other workmen engaged in the same work. On objection, the court excluded the evidence, to which defendant excepted. There was no error. *Williams* v. *United States,* 168 U. S. 382–397, 42 L. ed. 509–514, 18 Sup. Ct. Rep. 92. Had the defendant offered evidence of such reputation in the community where he lived, it would have been admissible to show what it was where he worked; but this he did not offer to do.

3. There was no error in the charge submitting the question of manslaughter to the jury. It was founded on the de-

fendant's own testimony, and was as favorable as he had any right to expect.

4. An exception was taken to the refusal of the court to give the following special instruction prayed by the defendant:

"If the jury find from the evidence that the deceased, Chipman, by his words and acts prior to the day he was killed, and on that day immediately before the killing, caused the defendant at the time of the killing to believe in good faith, and upon reasonable ground that he, Chipman, was about to make a deadly assault upon the defendant, then the jury are instructed that the defendant had the right to use the necessary means to defend himself against such apprehended assault, and if need be to kill his antagonist, if in good faith he believed that that was necessary to protect himself from deadly assault."

The court then gave the third instruction asked by the defendant, to the effect that if the jury believed that the deceased, just before the cutting which resulted in his death, approached the defendant in such a way as caused the defendant in good faith to believe, and gave him reasonable ground to believe, that deceased was about to make a deadly assault upon him, then the defendant was justified in acting upon that belief, even though it should appear as a matter of fact that deceased was not armed with the knife with which he was killed at the time.

In the general charge, the court instructed the jury in respect of the law of self-defense as applied to the defendant's evidence. The jury were told that in arriving at the state of mind of the defendant when he struck the fatal blow, as regards his belief of danger to life or serious bodily harm, they were to consider all of the evidence tending to show what the defendant had heard and knew of the conduct and character of the deceased, etc. The portion of the charge objected to was to the effect that the law does not leave to each man the right of acting upon his own particular belief at the moment, entirely aside from what the circumstances may be; but the law looks into the circumstances with the view of determining whether or not he had the right to believe what he may have

believed. "That brings in the second question, which is always necessary to be considered in the doctrine of self-defense, and that is to say, it is necessary before one may kill another in self-defense, that he shall actually have believed in his own mind at the very moment he strikes the blow, that then either his life is in danger, or that he is in danger of great bodily harm; and more than that, the circumstances which present themselves to his mind at the moment must be such as that they would have created in the mind of a reasonable man, the ordinary average man, a belief that he would have been in such danger in those same circumstances."

The objection urged to the foregoing statement of the law is that the test of the right to take life in self-defense is the actual belief of the defendant at the time, and not the belief that the circumstances would reasonably create in the mind of an ordinary person similarly situated. The objection is without merit. Before one can be permitted to take life under the apprehension that he is in danger of life or serious bodily harm from the violence of another, it must appear that he had a reasonable right to believe, from all the facts and circumstances presented to his mind, that he was in such danger.

The true test for the application of the jury is whether the circumstances presented to the mind of the defendant were such that they would have produced upon the mind of any reasonably prudent person, situated as the defendant was at the time, the reasonable belief that the deceased was then about to kill him or to do him serious bodily harm.

The instructions given on behalf of the defendant, and the accompanying charge of the court, correctly embodied the law as it has been declared and maintained without exception in this jurisdiction. *Beard* v. *United States,* 158 U. S. 550–564, 39 L. ed. 1086–1092, 15 Sup. Ct. Rep. 962, 9 Am. Crim. Rep. 324; *Wallace* v. *United States,* 162 U. S. 466–477, 40 L. ed. 1039–1043, 16 Sup. Ct. Rep. 859; *Allen* v. *United States,* 164 U. S. 492–498, 41 L. ed. 528–530, 17 Sup. Ct. Rep. 154; *Addington* v. *United States,* 165 U. S. 184–186, 41 L. ed. 679, 680, 17 Sup. Ct. Rep. 288; *Anderson* v. *United States,*

170 U. S. 481–508, 42 L. ed. 1116–1125, 18 Sup. Ct. Rep. 689; *Hopkins* v. *United States,* 4 App. D. C. 430–443.

Perceiving no error in the proceedings on the trial, the judgment will be affirmed. *Affirmed.*