STATE OF CONNECTICUT *v.* CHARLES ANDERSON
(14626)

PETERS, C. J., CALLAHAN, BORDEN, BERDON and NORCOTT, Js.

Argued April 29—decision released August 31, 1993

*Lauren Weisfeld,* assistant public defender, for the appellant (defendant).

*Paul J. Ferencek,* assistant state's attorney, with whom were *John M. Bailey,* state's attorney, and *Warren Maxwell,* assistant state's attorney, for the appellee (state).

NORCOTT, J. After a jury trial, the defendant, Charles Anderson, was convicted of assault in the first degree in violation of General Statutes § 53a-59 (a) (1)[1] and of

---

[1] General Statutes § 53a-59 (a) (1) provides: "(a) A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . ."

carrying a pistol without a permit in violation of General Statutes § 29-35.[2] He was sentenced to a total effective sentence of twenty years, execution suspended after seventeen years, and three years probation. The defendant appealed to the Appellate Court, which affirmed the conviction. *State* v. *Anderson,* 28 Conn. App. 833, 614 A.2d 438 (1992). We then granted the defendant's petition for certification to appeal limited to the following bifurcated question: "In the circumstances of this case, were the trial court's instructions on self-defense (a) erroneous and (b) if erroneous, harmless?" *State* v. *Anderson,* 224 Conn. 908, 615 A.2d 1048 (1992). We reverse the judgment of the Appellate Court and direct that the case be remanded to the trial court for a new trial.[3]

The following facts are relevant to this appeal. In the early morning of March 21, 1990, the victim, Albert Ashley, was involved in a craps game that included the defendant and another individual, "Cat" Bunkley, at an apartment in the Stowe Village housing development in Hartford. The game ended at approximately 2 a.m. when the victim had won all $1100 that had been wagered during the course of the game. Shortly after

---

[2] General Statutes § 29-35 provides in relevant part: "(a) No person shall carry any pistol or revolver upon his person, except when such person is within his dwelling house or place of business, without a permit to carry the same issued as provided in section 29-28. . . ."

[3] The state argues that the defendant's claim that the trial court's instruction on self-defense was erroneous was not properly preserved at trial and that the defendant cannot prevail under *State* v. *Golding,* 213 Conn. 233, 567 A.2d 823 (1989). We note that the Appellate Court resolved the *Golding* question by concluding that the trial court's "incorrect statement of the law" on self-defense was harmless beyond a reasonable doubt, thereby failing to satisfy the fourth prong of *Golding. State* v. *Anderson,* 28 Conn. App. 833, 838, 614 A.2d 438 (1992). Although the certified question does not explicitly refer to the defendant's challenge to the instruction as a *Golding* claim, because the defendant did not challenge the instruction at trial, review of the defendant's claim pursuant to *Golding* is inherent in our certification of the jury instruction issue.

the game ended, the victim and the defendant became involved in an argument over money at the victim's apartment. The defendant pulled a revolver from his coat and shot the victim in the right shoulder. As a result of the shooting, the victim's spinal cord was damaged and he was left paraplegic.

The state and the defendant presented two different versions of how the shooting had come to pass. According to witnesses for the state, when the game ended, the defendant approached the victim and asked that the victim return some of the money the defendant had lost. The victim replied, "I'll see what I can do." Thereafter, the victim left to count his winnings in his own apartment across the street. Being concerned for his safety while he was carrying a large amount of cash, the victim went downstairs to the apartment of his friends, William and Kenneth Stewart, and asked them to escort him across the street.

The defendant and Bunkley met and followed the victim and the Stewarts across the street. Kenneth Stewart overheard the defendant ask the victim, "[D]o you have something for me?" Upon arriving at his apartment, the victim let himself and the Stewarts inside through a door that opened to the kitchen. The defendant and Bunkley were left to wait in the hallway.

Once in the apartment, the victim began to count his money and the defendant knocked on the door. When the victim opened the door, the defendant repeated his request for money. The victim told the defendant to wait until he had finished counting the money and closed the door again. The defendant proceeded to pound on the door and the victim again opened it and told the defendant to wait. When the victim attempted to close the door again, the defendant stuck his foot inside the doorway. The victim then went to light a cigarette over a stove located near the kitchen door where

the defendant was standing. As he did this, the defendant pulled a revolver from his trench coat and shot the victim. The defendant then fled.[4]

The defendant testified at trial and gave a different version of the events leading up to the shooting. He testified that one year prior to the shooting, the defendant had loaned the victim $150, which the victim had promised to repay within three days. After two weeks had gone by, the defendant demanded repayment and the victim responded that the defendant should not approach him about money any more. A few months later, the defendant and his fiancee, Joann Robinson, saw the victim as they were driving through Stowe Village. The defendant again asked the victim for the money he had borrowed. The victim revealed a pistol tucked in his waist and warned the defendant, "I'll fuck you up if you ask me for this money again."[5] After this encounter, the defendant did not pursue the matter of the money again because he knew that the victim used drugs and that he had a reputation for violence.

The defendant further testified that, on the night of the shooting, he had watched but had not participated in the craps game. After the defendant had seen the victim win $1100 in cash, he decided to pursue once again the matter of the unpaid loan. The victim ignored the defendant's request and, upon entering the Stewarts' apartment downstairs, slammed the door in the defendant's face. The defendant testified that he had waited for approximately twenty-five minutes outside the Stewarts' apartment, and when the victim

[4] About two weeks later, the Hartford police located the defendant driving on Albany Avenue in Hartford. The defendant had on his person a .380 automatic pistol, clip and ammunition for which he had no permit. This weapon was the one that had been used by the defendant in the shooting.

[5] At trial, Robinson corroborated the defendant's version of the exchange with the victim at the Stowe Village development. She also testified that the victim had a reputation as a dangerous person with a criminal record.

exited and began walking toward his apartment, the defendant followed with Bunkley.

The defendant testified that, when they arrived at the victim's apartment, he had tried to persuade the victim to repay the loan. The victim entered his apartment and again slammed the door in the defendant's face. Shortly thereafter, the Stewarts arrived and the victim let them enter the apartment. The defendant then moved into the threshold and again asked for his money. The victim responded, "Don't ask me for that money no more or I'm going to fuck you up." When the defendant asked him why he was being so unreasonable, the victim answered, "I'm going to show you why," and then quickly reached for a nearby drawer located beneath a kitchen counter. The defendant testified that he had believed that the victim was under the influence of several intoxicants, and, because the victim had previously threatened him with a gun, he had believed that the victim was reaching for a gun. The defendant testified that he had shot the victim in order to defend himself.[6]

The defendant requested that the trial court charge the jury on self-defense pursuant to General Statutes § 53a-19.[7] As part of the charge on self-defense, the

---

[6] The victim was shot with a .380 semiautomatic pistol that the defendant had illegally purchased. The defendant testified during cross-examination that he had purchased the gun after being robbed at gunpoint in Stowe Village and finding an intruder in his home on Oakland Terrace in Hartford.

[7] General Statutes § 53a-19 provides: "(a) Except as provided in subsections (b) and (c) of this section, a person is justified in using reasonable physical force upon another person to defend himself or a third person from what he reasonably believes to be the use or imminent use of physical force, and he may use such degree of force which he reasonably believes to be necessary for such purpose; except that deadly physical force may not be used unless the actor reasonably believes that such other person is (1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm.

"(b) Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using deadly physical force upon another person

trial court defined the term "reasonable force" as "force which an average person of ordinary intelligence in like circumstances would judge to be necessary to prevent injury and no more."[8] The trial court also instructed the jury that "[t]he defendant, claiming a justification of self-defense, is permitted to use deadly force in two broad circumstances. He may justifiably use deadly force only if he reasonably believed that the other person was about to use deadly physical force or about to inflict great bodily harm. The law does not encourage the use of deadly force and in most circumstances, a person must retreat from the perceived harm, if he knows he could avoid the necessity of using force by retreating, if he is able to do so with safety."[9]

On the defendant's appeal to the Appellate Court, the majority concluded that the trial court's instructions on self-defense contained incorrect statements of

if he knows that he can avoid the necessity of using such force with complete safety (1) by retreating, except that the actor shall not be required to retreat if he is in his dwelling, as defined in section 53a-100, or place of work and was not the initial aggressor, or if he is a peace officer or a private person assisting such peace officer at his direction, and acting pursuant to section 53a-22, or (2) by surrendering possession of property to a person asserting a claim of right thereto, or (3) by complying with a demand that he abstain from performing an act which he is not obliged to perform.

"(c) Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using physical force when (1) with intent to cause physical injury or death to another person, he provokes the use of physical force by such other person, or (2) he is the initial aggressor, except that his use of physical force upon another person under such circumstances is justifiable if he withdraws from the encounter and effectively communicates to such other person his intent to do so, but such other person notwithstanding continues or threatens the use of physical force, or (3) the physical force involved was the product of a combat by agreement not specifically authorized by law."

[8] At a later point in the instruction, the trial court again defined reasonable force as "the amount of force that would be used by an average person of ordinary intelligence acting under the same circumstances."

[9] The trial court repeated the defense and again stated: "[T]hat person must retreat from the perceived harm if he can do—can avoid the necessity of using force by retreating and with safety."

law regarding two elements: (1) the duty to retreat "with safety"; and (2) the standard by which the jury was to evaluate the "reasonable force" that one may use to defend oneself. As to the instruction on the duty to retreat, the court stated that the failure to instruct the jury in accordance with the statutory language "with complete safety" contained in § 53a-19 "may be improper." *State* v. *Anderson,* supra, 28 Conn. App. 840. The court also concluded that the trial court's instruction regarding "reasonable force" replaced the subjective-objective standard required by § 53a-19 with a strictly objective standard. Id., 838.

The majority of the Appellate Court nonetheless concluded that these errors were harmless beyond a reasonable doubt because it was not reasonably possible that the jury had been misled. The court stated that the jury could not have been misled by the instruction regarding the defendant's duty to retreat because "[t]he term safety . . . necessarily entails complete safety and thus the absence of the word 'complete' from the trial court's instructions was harmless beyond a reasonable doubt." Id., 841. As to the instruction on "reasonable force," the court noted that the case was factually similar to *State* v. *Williams,* 25 Conn. App. 456, 462–63, 595 A.2d 895, cert. denied, 220 Conn. 916, 597 A.2d 339 (1991), and concluded that this error was harmless on the basis of the reasoning contained in that case.

The defendant claims that the Appellate Court properly concluded that the instruction on self-defense was erroneous, but that it improperly concluded that the erroneous instruction was harmless beyond a reasonable doubt. The defendant argues that the only contested issue in this case was whether the state had disproved the defendant's assertion that he had acted in justifiable self-defense. The defendant contends that the erroneous instruction diluted the state's burden of

disproving the defense beyond a reasonable doubt, and for that reason, amounted to reversible error.

The state claims that the trial court's instruction was not erroneous. The state argues that the trial court's instruction on the duty to retreat, although not delivered in the verbatim language of § 53a-19, did not alter the substantive meaning of the statute. The state also argues that the trial court's instruction, read as a whole, properly explained the manner in which the jury was to evaluate the defendant's use of "reasonable force."[10] Alternatively, the state argues, even if these two portions of the instruction were erroneous, the error was harmless beyond a reasonable doubt. We agree with the defendant.

" '[A] fundamental element of due process is the right of a defendant charged with a crime to establish a defense. *Washington* v. *Texas,* 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967); *State* v. *Bethea,* 167 Conn. 80, 83, 355 A.2d 6 (1974). This fundamental constitutional right includes proper jury instructions on the elements of self-defense so that the jury may ascertain whether the state has met its burden of proving beyond a reasonable doubt that the assault was not justified.' " *State* v. *Corchado,* 188 Conn. 653, 660, 453 A.2d 427 (1982). A defendant who asserts a recognized legal defense, the availability of which is supported by the evidence, is entitled as a matter of law to a theory of defense instruction. *State* v. *Fuller,* 199 Conn. 273, 278, 506 A.2d 556 (1986); see also *United States* v. *Alfonso-Perez,* 535 F.2d 1362, 1365 (2d Cir. 1976). The standard of review to be applied to the defendant's constitutional claim is whether it is reasonably possible that

---

[10] The state argues that each of these two portions of the trial court's instruction on self-defense, therefore, fails to meet the third prong of *State* v. *Golding,* 213 Conn. 233, 240, 567 A.2d 823 (1989), that "the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial . . . ."

the jury was misled. *State* v. *Hall,* 213 Conn. 579, 587, 569 A.2d 534 (1990); *State* v. *Corchado,* supra, 660.

We first consider the trial court's instruction that, before justifiably using deadly physical force, the defendant had a duty to retreat if he could do so "with safety." Section 53a-19 (b) (1) provides that retreat is necessary only if a person can do so "with *complete* safety." (Emphasis added.) The Appellate Court majority concluded that the omission of the term "complete" from the trial court's instruction regarding the duty to retreat did not alter the substantive meaning of the statute because "[t]he term safety . . . necessarily entails complete safety . . . ." *State* v. *Anderson,* supra, 28 Conn. App. 841. The dissenting opinion, *Lavery, J.,* noted, however, that if there was no distinction between "safety" and "complete safety," then the term "complete" would serve no purpose in the statute and would be surplusage. Id., 853.

We agree with the dissenting opinion that, for the purposes of the defense of self-defense, to say that there is no distinction between "safety" and "complete safety" runs contrary to our rules of statutory construction. In addition, the conclusion that the difference between "safety" and "complete safety" is significant comports with the development in the law of the duty to retreat as part of a claim of self-defense.

Although the legislative history is silent as to the significance of the term "complete safety," we are guided by certain well established maxims of statutory construction. Penal statutes are to be strictly construed against the state, and the words and phrases contained in them are to be understood according to the commonly approved usage of the language. *State* v. *Hufford,* 205 Conn. 386, 392, 533 A.2d 866 (1987). "In construing a statute, this court seeks to ascertain the

intent of the legislature as it is expressed through the words actually used." *State* v. *Grant,* 176 Conn. 17, 20, 404 A.2d 873 (1978). "[N]o part of a legislative enactment is to be treated as insignificant or unnecessary, and there is a presumption of purpose behind every sentence, clause or phrase . . . and no word in a statute is to be treated as superfluous." (Citation omitted; internal quotation marks omitted.) *Peck* v. *Jacquemin,* 196 Conn. 53, 66, 491 A.2d 1043 (1985).

In light of these standards, we are not persuaded that the legislative use of the word "complete" as a modifier of the word "safety" has no independent significance. The word "complete" conveys a unique sense of finality. "The common meaning of the word 'complete' is 'Filled up, with no part, item or element lacking.' " *Loew's, Inc.* v. *Wolff,* 101 F. Sup. 981, 986 (S.D. Cal. 1951), aff'd, 215 F.2d 651 (9th Cir. 1954). "Complete" is defined in Webster's Third New International Dictionary as "entire; perfect," implying the inclusion of all that is needed for the fulfillment of something. For example, to have "complete" confidence in someone certainly imports more than simply having "confidence" in that person.

In the context of the self-defense statute, the use of the term "complete" with respect to the duty to retreat "with complete safety" cannot be ignored as legislative surplusage. If safety really meant complete safety, as the Appellate Court determined, the legislature would not have put the term "complete" into the statute. As the dissenting opinion in the Appellate Court correctly observed, "[a] commonsense reading of the statutory language indicates that the legislature intended that the state must meet the higher burden of showing that the defendant could have retreated with complete safety, not with mere safety." *State* v. *Anderson,* supra, 28 Conn. App. 854 (*Lavery, J.,* dissenting).

Our conclusion that the term "complete safety" within § 53a-19 (b) has distinct significance that is not subsumed in the term "safety" is also supported by the history of the duty to retreat element of self-defense. It is generally agreed that one who can safely retreat is not required to do so before using *nondeadly* force[11] in self-defense. A tension among competing interests exists, however, if *deadly* force is required, and raises the question of whether the defender has a duty to retreat.[12] See 1 W. LaFave & A. Scott, Substantive Criminal Law (1986) § 5.7 (f), p. 659. One early English authority wrote, regarding the common law on the duty of retreat, that "[t]he minuteness of the law contained in the authorities . . . is a curious relic of a time when police was lax and brawls frequent, and when every gentleman wore arms and was supposed to be familiar with the use of them." Sir J. Stephen, A Digest of the Criminal Law (7th Ed. 1926) pp. 202–203 n.4.

---

[11] Indeed, some jurisdictions specifically have codified the rule that a person need not retreat before using nondeadly force in self-defense. See Del. Code Ann. tit. 11 § 464; Haw. Rev. Stat. § 703-304; Neb. Rev. Stat. § 28-1409; N.J. Stat. Ann. § 2C:3-4; Pa. Cons. Stat. Ann. tit. 18, § 505.

[12] The competing interests inherent in the duty to retreat are expressed in two early cases of the United States Supreme Court. In 1895 the court approved the notion of "standing one's ground" when it wrote: "[A] true man who is without fault is not obliged to fly from an assailant who by violence or surprise maliciously seeks to take his life or to do him enormous bodily harm." *Beard* v. *United States*, 158 U.S. 550, 561, 15 S. Ct. 962, 39 L. Ed. 1086 (1895).

One year later, in *Allen* v. *United States*, 164 U.S. 492, 497, 17 S. Ct. 154, 41 L. Ed. 528 (1896), the same court sustained the following jury instruction: " 'If [the defendant] is attacked by another in such a way as to denote a purpose to take away his life, or to do him some great bodily harm . . . he may lawfully kill the assailant. . . . Provided he use all the means in his power otherwise to save his own life or prevent the intended harm, such as retreating as far as he can, or disabling him without killing him, if it be in his power.' " The court distinguished the *Beard* case, stating that "[t]he general duty to retreat instead of killing when attacked" was not at issue in *Beard.* Id., 498.

Today, the majority of American jurisdictions holds that a person who is not the initial aggressor need not retreat, even though he can do so safely, before using deadly force upon an assailant whom he reasonably believes will kill him or do him serious bodily harm. 1 W. LaFave & A. Scott, supra, pp. 659–60. This position rests on the rationale that a person who is not the initial aggressor should be permitted to stand his ground in the face of a deadly assault, and that to retreat may be considered to be cowardly and dishonorable. See J. Beale, "Retreat from a Murderous Assault," 16 Harv. L. Rev. 567, 577 (1903).

Connecticut is among a minority of jurisdictions, however, that has followed the position advanced by the Model Penal Code that, before using deadly force in self-defense, an individual must retreat. Retreat is required, however, only if it can be achieved with complete safety.[13] The underlying policy of the duty to retreat is that the protection of human life has a higher place in the scheme of social values than the value that inheres in standing up to an aggression. 2 P. Robinson, Criminal Law Defenses (1984) § 131 (d), pp. 84–85.[14]

[13] The "complete safety" language appears in the following penal codes as well as in that of Connecticut: Ala. Code § 13A-3-23; Alaska Stat. § 11.81.335; Ark. Stat. Ann. § 5-2-607; Del. Code Ann. tit. 11, § 464; Haw. Rev. Stat. § 703-304; Me. Rev. Stat. Ann. tit. 17-A, § 108; Neb. Rev. Stat. § 28-1409; N.H. Rev. Stat. Ann. § 627:4; N.J. Stat. Ann. § 2C:3-4; N.Y. Penal Law § 35.15 (McKinney); Pa. Cons. Stat. Ann. tit. 18, § 505.

We note that in virtually all of those jurisdictions espousing the minority position on the retreat rule, the rule is not applicable to a peace officer or a person assisting him or her in the performance of police duties. 1 W. LaFave & A. Scott, Substantive Criminal Law (1986) § 5.7 (f), p. 660 n.64. Furthermore, in Connecticut, a person is not required to retreat if he is in his home or place of work and was not the initial aggressor. General Statutes § 53a-19 (b) (1).

[14] One commentator on this subject argued that "[a] really honorable man, a man of truly refined and elevated feeling, would perhaps always regret the apparent cowardice of a retreat, but he would regret ten times more, after the excitement of the contest was past, the thought that he had the blood of a fellow-being on his hands." J. Beale, "Retreat from a Murderous Assault," 16 Harv. L. Rev. 567, 581 (1903).

The Model Penal Code § 3.04 (2) (b) (ii) states that the use of deadly force in self-defense is not justifiable if "the actor knows that he can avoid the necessity of using such force with complete safety by retreating . . . ." The "complete safety" language of the Code is used in all of the states that follow the minority position regarding the duty to retreat. The commentaries to the Code implicitly recognize the nuanced, but significant, difference between "complete safety" and "safety" by stating that "[w]ith a standard of this nature, it is to be expected that *all doubts* will be resolved in the actor's favor, and that such moral claim as there is to standing one's ground can easily be recognized in the doubtful cases." (Emphasis added.) I A.L.I., Model Penal Code and Commentaries (1985) § 3.04, p. 55.

The Model Penal Code, thus, reconciled the value of preserving life with the need to act in self-defense by imposing a duty to retreat, and limited that duty with an absolute condition, that retreat need be made only if it could be done with "complete safety." We are persuaded that our legislature's use of the term "complete safety" in § 53a-19 (b) evinces its determination that, in balancing community interests, the retreat rule should be governed by the considerations ultimately embodied in § 3.04 (2) (b) (ii) of the Model Penal Code. Our conclusion that the term "complete safety" connotes a standard that is more absolute than mere "safety," therefore, is further supported by these considerations.

We conclude that the term "complete safety" in § 53a-19 (b) is indicative of a higher burden on the state when the defense of self-defense is raised than that suggested by the term "safety." The Appellate Court improperly concluded, therefore, that the failure of the trial court to instruct that the defendant need retreat only if he could do so in "complete safety" did not sub-

stantively alter the meaning of § 53a-19. We conclude that the omission of the word "complete" altered the meaning of the statute and was therefore erroneous.

The omission of the term "complete" from the instruction on the duty to retreat, in the circumstances of this case, also made it reasonably possible that the jury was misled. *State* v. *Corchado,* supra, 663. The only contested issue in this case was whether the state had disproved the defendant's claim of self-defense. There was testimony that the victim was known as a violent individual and drug user, that he had threatened the defendant with a gun before, and that the defendant had previously been robbed at gunpoint in the Stowe Village complex by an unknown individual. The defendant testified at trial that he had believed that he did not have time to retreat and that, had he attempted to retreat, the victim would have shot him in the back. Thus the question of whether the defendant could have retreated in complete safety was central to his claim of self-defense pursuant to § 53a-19.

The defendant was entitled to have the trial court correctly instruct the jury on the element of his self-defense claim regarding his duty to retreat. " ' "[T]he charge must be considered from the standpoint of its effect on the jury in guiding them to a proper verdict." ' *State* v. *Williams,* 182 Conn. 262, 269,. 438 A.2d 80 (1980)." *State* v. *Fuller,* supra, 279. In this case, we conclude that it is reasonably possible that the charge did not perform this function and that the jury was misled. Although the Appellate Court concluded that the instruction was harmless beyond a reasonable doubt, we are not persuaded beyond a reasonable doubt of its harmlessness. We, therefore, conclude that the instructional error requires a new trial.

Because our conclusion that the instruction on the duty to retreat was harmful error is dispositive of this

appeal, we need not reach the issue of whether the "reasonable force" portion of the trial court's instruction on self-defense was erroneous and, if so, whether that error was harmless. The state concedes that the instruction that "reasonable force" is "that force which an average person of ordinary intelligence in like circumstances would judge to be necessary to prevent injury and no more," failed to direct the jury to evaluate the defendant's subjective belief as to the amount of force necessary. The state argues, nonetheless, that this instruction, in the context of the entire self-defense instruction, could not have misled the jury into applying a purely objective standard, and therefore did not amount to reversible error.

Although we do not reach this issue, we do emphasize again that the correct standard regarding the test for the degree of force in self-defense is the subjective-objective one set forth in *State* v. *Corchado,* supra. In *Corchado* we noted that § 53a-19 "focuses on the person, here the defendant . . . claiming self-defense. It focuses on what *he* reasonably believes under the circumstances and presents a question of fact . . . . This statutory emphasis upon the defendant further demonstrates the function of the jury in their evaluation of the self-defense claim." (Emphasis in original.) Id., 663; see also *State* v. *DeJesus,* 194 Conn. 376, 389 n.13, 481 A.2d 1277 (1984) ("The Connecticut test for the degree of force in self-defense is a subjective-objective one. The jury must view the situation from the perspective of the defendant. . . . The defendant's belief ultimately must be found to be reasonable."). We also note in passing that there is nothing in that test that refers to a "person of ordinary intelligence." We discourage the use of instructional language that strays from the *Corchado* subjective-objective standard in any significant manner.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to reverse the judgment of the trial court and to remand the case for a new trial.

In this opinion PETERS, C. J., BORDEN and BERDON, Js., concurred.

CALLAHAN, J., dissenting. I respectfully dissent. I would affirm the majority opinion of the Appellate Court.