18 N.J. Super. 154 (1952)
86 A.2d 780
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
RALPH CENTALONZA, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued January 14, 1952.
Decided February 21, 1952.
*156 Before Judges JACOBS, EASTWOOD and BIGELOW.
Mr. Richard J. Congleton, Essex County Prosecutor, argued the cause for the State (Mr. C. William Caruso, of counsel, on the brief).
Mr. Leon W. Kapp argued the cause for the appellant (Kapp Brothers, attorneys; Mr. Herman W. Kapp, on the brief).
The opinion of the court was delivered by BIGELOW, J.A.D.
The defendant was convicted of an assault with intent to kill, after a trial in which there was no dispute as to the basic facts: Early on Tuesday, July 25, 1950, shortly after midnight, on North Willow Street, Montclair, in front of the home of his sister, Mrs. Mondsini, defendant shot one Nicholas De Falco with an automatic pistol. The bullet passed through his arm and into his abdomen and lodged so close to his spine that the surgeons have not tried to remove it. Defendant testified that he *157 feared that De Falco was about to attack him, that he shot in self-defense, that he did not intend the bullet to hit De Falco but was trying to scare him away.
The State's version of events leading up to the assault differs considerably from the defendant's. We will summarize the defendant's recital. On Monday, about 12 hours before the shooting, defendant went to Verona to demand $100 owed him by "Chief" Cammarata. Cammarata refused to pay, saying, "Well, if you want your money, see Mickey (De Falco's nickname). If I were you, I wouldn't go near him, either." And as defendant was walking away, Cammarata added, "Well, see me at 11 o'clock tonight in front of the restaurant," referring to a place on Bloomfield Avenue, Montclair, where defendant and his friends were accustomed to meet. Defendant testified that when De Falco's name was mentioned, he realized he was in trouble. "I feared the man." On two earlier occasions De Falco had beaten him brutally, and had threatened to kill him.
The defendant spent the early part of the evening at the home of his sister, Mrs. Mondsini. Shortly before 11 o'clock, the hour set by Cammarata, he left with one Foglia, whom he had asked to drive him to the restaurant. As they approached the restaurant, they saw Cammarata get into an automobile and drive away. They followed and after a few blocks, drew alongside his car. Defendant hollered, "Chief, get out; I want to speak to you." Cammarata stopped. "So we met and I asked him, `How about that money you owe me.'" After a few words, Cammarata led the way back toward the restaurant. As he started his car, he shouted, "Wait until I get Mickey; he will knock your Goddamn brains out." Defendant did not pause at the restaurant but crossed Bloomfield Avenue, and on to his sister's house. He stayed there only a few minutes, then to his own apartment to get a pistol, and back to the Mondsini's. At about midnight, Foglia and Mrs. Paterno (a member of the family) in one car, and defendant in another, started to leave. At that moment, De Falco, with Cammarata and two other men, *158 drove up and called to defendant, "Get out of the car." When everyone had alighted, De Falco and Cammarata, with the other two men, walked toward defendant. Cammarata carried a club, while De Falco had his hand in his waist. He threatened defendant, "I will give you your money in your grave." "As he got within about six or eight feet, I would say, closer to me, he pulled his hand out of his waist, and it looked like  it was shiny at night  and it looked like a gun. So I pulled my gun out of my pocket and shot."
Cammarata testified for the State that defendant demanded money from him, though he owed defendant nothing. That the night of the shooting, when he and the other three men, in their car, came opposite Mrs. Mondsini's home, they saw defendant and another man on the sidewalk and heard one of them call, "Hey, I want to see you." They stopped and Cammarata and De Falco stepped out of their car and walked toward defendant and Foglia, while defendant came toward them. De Falco asked defendant why he did not leave Cammarata alone. "Centalonza says some curse words at us and said (to De Falco) `I warned you not to bother me,' or something like that, and shot him." He denied that he carried a club or De Falco a pistol.

I.
It is unnecessary to recite more of the testimony. Defendant argues as the first reason for reversal that the weight of the evidence did not support the verdict. We have no difficulty in reaching the opposite conclusion.

II.
De Falco, the alleged victim of the assault, testified for the State, merely that he had been convicted of crime, that he did not know who shot him, and that the bullet went through his arm and lodged in his back. On cross-examination, he was asked concerning relations between De Falco and defendant prior to the day laid in the indictment. *159 Counsel for defendant stated that he intended, by the cross-examination, to prove acts of violence committed by De Falco on earlier occasions, and that the evidence was pertinent to the issue of self-defense. Judge Conlon, before whom the trial was held, sustained objections on the ground that the questions went beyond the scope of the direct examination.
It is entirely settled that on cross-examination, a witness may not be examined relative to matter upon which he was not examined in chief, and which is material only by way of defense. State v. Murphy, 87 N.J.L. 515, 529 (E. & A. 1915). But in a civil cause, at least, the trial judge in his discretion may permit cross-examination of a witness who is also a party on any matter relevant to the issues, though it was not touched in the direct examination. Weiss v. Weiss, 95 N.J.L. 125 (E. & A. 1920). But the immediate victim of a crime, though he makes the formal complaint which starts the prosecution, is not a party at the trial of the indictment or in privity with a party, for the only parties are the State and the defendant. For this reason, admissions made by the victim before trial are not competent evidence. State v. Brady, 71 N.J.L. 360 (Sup. Ct. 1904); State v. Calabrese, 99 N.J.L. 312 (Sup. Ct. 1924), affirmed 100 N.J.L. 412 (E. & A. 1924). And for the same reason, when the victim testifies for the State, he is not open to cross-examination beyond the scope of the testimony given on direct examination. State v. Zeilman, 75 N.J.L. 357, 363 (Sup. Ct. 1907).

III.
The court charged:
"An accused is justified in using force even to the extent of taking life to defend his person when force is necessary or force reasonably appears to be necessary to accomplish that end. If the injury apprehended could be otherwise avoided, the accused was bound to avoid the danger without resorting to violence, and even if the circumstances be such as to require the use of force to repel the assault, he will be inexcusable if he carried his defense *160 beyond the bounds of necessity. The danger must be immediate; it must be actual or apprehended on reasonable grounds, of which you, the jury, are the judges. Whether the necessity for using force existed must be determined by you from the situation with which the accused was faced at the time of question."
Defendant objects to the sentence reading: "If the jury apprehended could be otherwise avoided, the accused was bound to avoid the danger without resorting to violence." He urges that one who is where he has a right to be, and who is threatened with attack, may use sufficient force to repel or prevent the attack, without trying to avoid the danger, provided he does not kill the attacker. The rule that governs in homicide cases was stated in State v. di Maria, 88 N.J.L. 416 (Sup. Ct. 1916), affirmed 90 N.J.L. 341 (E. & A. 1917):
"Where a defendant indicted for homicide sets up self-defence as an excuse or justification for his act he must show that the killing was, or reasonably appeared to be, necessary, in order to preserve his own life or to protect himself from serious bodily harm. This being so, it follows as a logical sequence that when it is shown that the person assaulted could have completely protected himself without taking the life of his adversary, and that it was apparent to him that he could do so, the absence of the necessity of killing for his own preservation is demonstrated. And how can it truly be said that no means of self-protection other than the killing of his adversary existed when it is shown that a safe way of retreat was open to him, and that by taking advantage of it he could have avoided the threatened danger to life or limb?"
In the case before us, the jury found as a fact that defendant intended to kill De Falco when he shot him. The instructions on the subject of self-defense are not erroneous, if they correctly state the law applicable to that situation. The rule of State v. di Maria is founded on sound morality and public policy. It has been pithily stated that "When it comes to a question whether one man shall flee or another shall live, the law decides that the former shall flee rather than that the latter shall die." Commonwealth v. Drum, 58 Pa. St. 9, 22 (Sup. Ct. 1868). A man who attempts to take the life of another, can successfully justify his action *161 on the ground that his own life was threatened only if it seemed that the danger could not be avoided except by taking the life of his assailant. In our opinion, the objection to the charge on self-defense is not sound. State v. Goldberg, 12 N.J. Super. 293 (App. Div. 1951), does not apply, for it deals only with a simple assault and battery, where no weapon was employed by the defendant.

IV.
The defendant argues that the trial court erred by charging the law of flight, since there was no evidence that he had fled. The court introduced the subject as follows:
"The State further contends that immediately upon the shooting the defendant took to flight and proceeded to Newark to his mother-in-law's home where he was subsequently apprehended. Now you may or may not determine that the actions of the defendant constituted flight from the evidence that you heard."
The State did, in fact, and still does, contend that defendant fled. Without reviewing the evidence, we will state our conclusion that the fact of flight was arguable and that the proofs gave a sufficient basis for the court's charge on the subject. The court charged:
"Flight, standing alone, after a wrong done, raises no legal presumption of guilt, but if you, the jury, from all of the evidence in the case, are convinced beyond a reasonable doubt that the defendant shot De Falco and that knowing that he had done so and fearing that an accusation would be made against him, and for the purpose of evading that accusation, took refuge in flight, then you may take that flight into consideration in connection with all the other testimony and evidence in the case, because the flight of the defendant after the commission of the deed is a circumstance tending to prove consciousness of guilt."
Defendant urges that this statement is erroneous because it is only when the flight is unexplained that it raises a presumption of guilt. State v. Jaggers, 71 N.J.L. 281 (E. & A. 1904); State v. Menzel, 136 N.J.L. 233 (Sup. *162 Ct. 1947), affirmed 137 N.J.L. 616 (E. & A. 1948). But the court did not charge that flight raises a presumption of guilt; to the contrary, the jury were told that flight does not raise such a presumption. The charge was perhaps overly favorable to the defendant and certainly did not prejudice him.

V.
Defendant objected to the court's definition of reasonable doubt:
"By a reasonable doubt is not meant a mere possible or imaginary doubt. It is that state of the case where, after an examination and comparison of all the evidence, or from a want of sufficient evidence, you cannot say that you feel an abiding conviction to a moral certainty of the truth of the charge. That is expressing the thought in rather negative terms. To express the same thought in positive terms: If, after an entire comparison and consideration of all of the evidence, you find you can say you feel an abiding conviction to a moral certainty of the truth of the charge, you are then satisfied beyond a reasonable doubt within the meaning of that term in the law."
Counsel argues that the last sentence withdrew from the consideration of the jury the question whether there was such an insufficiency of evidence as to give rise to a reasonable doubt. State v. Andrews, 77 N.J.L. 108 (Sup. Ct. 1908); State v. De Paola, 5 N.J. 1, 9 (1950). We do not see how the instruction could be so construed. The jury was required first to consider all the evidence, and then to decide whether or not they were convinced of the truth of the charge. But the court did not hint that a reasonable doubt must be based on what the witnesses testified to, rather than on a want of evidence. We find no error. Indeed, Judge Conlon's charge on reasonable doubt is a model of clarity.
We have considered the other grounds urged for reversal and find no merit in them. The judgment is affirmed.