Commonwealth *v.* Ricci et al., Appellants.

558

Argued November 18, 1954. Before RHODES, P. J., HIRT, ROSS, GUNTHER, WRIGHT and ERVIN, JJ. (WOODSIDE, J., absent).

*Charles J. Margiotti, Charles B. Jarrett* and *Harold Gondelman,* with them *V. J. Rich, M. Barney Cohen* and *Margiotti & Casey,* for appellants.

*William J. O'Donnell,* Assistant District Attorney, with him *James F. Malone, Jr.,* District Attorney, for appellee.

OPINION BY WRIGHT, J., March 24, 1955:

At April Sessions, 1952, the Allegheny County Grand Jury returned eight bills of indictment as follows: No. 209 charging Ernest Dequenne with accepting a bribe from Fred Fiori; No. 210 charging Dequenne with misbehavior in office; No. 211 charging Fiori with giving a bribe to Caesar Ricci; No. 212 charging Fiori with giving a bribe to Dequenne; No.

213 charging Fiori with giving a bribe to John J. Mullen; No. 214 charging Ricci with accepting a bribe from Fiori; No. 215 charging Ricci with misbehavior in office; and No. 216 charging that Ricci and Dequenne conspired together between themselves and with Fiori and other persons unknown to accept a bribe from Fiori. These eight indictments were consolidated for the purposes of trial, which lasted for nine days with a record of 1332 pages. Following verdicts of guilty, motions for new trial and in arrest of judgment were filed. The motions were overruled by the court en banc, sentences were imposed, and these appeals followed.

The governing body of the third class city of Clairton consists of four councilmen and a mayor, each being entitled to one vote. Ricci and Dequenne were members of council, and Mullen was the mayor. The city owned a tract of approximately 66 acres of land containing coal deposits, and known as the Gun Club Site. In 1948 and again in 1950 council discussed letting a contract for stripping this coal in order to raise additional revenue. Public bids were advertised for, but none were received. Subsequently, a Mr. Lhormer made an offer of 50¢ a ton, which he later increased to 60¢ a ton, and a contract was awarded to him. Fiori was to be a sub-contractor under Lhormer. This contract was afterward cancelled by mutual agreement. In April, 1951, Fiori attended a council meeting and discussed the terms of the coal stripping project. According to Mullen's testimony, during the week of October 14, 1951, Dequenne came to his home and said "that he had a proposition that had been brought to him by Councilman Ricci, whereby he could make some money from the coal up at the Gun Club Site, . . . that Mr. Fiori had offered to give the three of us each one thousand dollars, with the

understanding that as the coal was taken out, as it progressed, the operation, we would get more money until we each should get eventually around between three and four thousand dollars, and he asked me if I was interested and I said, yes, I was interested".[1] Mullen further testified that in the following week, on October 24, 1951, Fiori came to his home "and said that he had learned from Mr. Dequenne that I was going along on this coal deal and was pleased about it and gave me an envelope which he said contained a thousand dollars to seal the bargain. I asked him if Mr. Dequenne and Mr. Ricci were getting the same, if I understood the agreement properly, and he said, 'Yes, each got a thousand and this is yours' ". In the next few days Mullen consulted the City Solicitor, the City Clerk, and several other prominent persons. He was not permitted to testify as to these conversations. Mullen then testified that on Wednesday evening, October 31, 1951, following a political rally, Dequenne asked "if I would come over and get in Ricci's car". Thereupon the three of them discussed the manner in which they would present the contract in council. According to Mullen, Ricci said, "I understand now that you're going along on this thing and that Fred was down to see you". Mullen replied "He gave me a thousand dollars and told me he gave each of you a thousand too". Ricci and Dequenne then said, "Yes, it was true". Discussion continued as to "how we were going to bring this thing up . . . They said they'd bring it up at one of the future meetings". Mullen then testified relative to a council meeting held on December 29th, commencing in the morning. During a recess, Ricci informed Mullen that arrangements had been

---

[1] On cross examination Mullen explained that he "wanted to find out what it was all about and who was involved".

made to have Fiori present that afternoon to conclude the coal deal. Mullen instructed the City Controller to object to the awarding of the contract without bids. When the matter came up that afternoon, Ricci stated, according to Mullen, "that in view of the fact that it was urgent, because our own incinerator was in bad shape and because it was a question of what was good for the community, that he didn't think we would have to worry about bids, that that justified going ahead and doing it then". In view of the Controller's objection, no final action was taken. Meanwhile, on December 12, 1951, Mullen had consulted with President Judge McNAUGHER who sent him to the District Attorney's office. There the envelope given to Mullen by Fiori was unsealed and opened and found to contain one thousand dollars in bills. At the direction of the District Attorney, a microphone and a sound recorder were installed in Mullen's office. This arrangement did not operate satisfactorily, and the recorder was then placed in Mullen's home. On December 20, 1951, there was recorded a conversation between Fiori and Mullen. On January 1, 1952, Police Chief Orsini arranged to record a conversation between Dequenne and Mullen. On February 23, 1952, appellants were arrested. At a council meeting that evening the microphone in Mullen's office was discovered. Later that evening Ricci telephoned Orsini and arranged to come to his house. Ricci said that "Us Italians ought to stick together", and "wanted to know what was on the tape recording . . . and where they were at". The next morning Ricci and Dequenne attempted to obtain the office keys. They then endeavored to secure a ladder to get in a window of the office. Orsini also testified that on June 25, 1952, Dequenne said to him "If you don't change your testimony you're going to be demoted".

Each of the appellants took the stand, denied any wrongdoing, and accused Mullen of attempting a frameup because of political differences. Ricci and Dequenne admitted that they were in the car with Mullen on October 31, 1951, but stated that the conversation involved political harmony. Their purpose in gaining access to Mullen's office was to photograph the microphone. On cross examination Dequenne was asked about a conversation at his house with Joseph Vitori and Louis Runatz. He stated that it related solely to the dismissal of the City Solicitor. In rebuttal, Vitori and Runatz testified that their conversation with Dequenne did not concern dismissal of the City Solicitor but did involve an accusation of complicity in the bribing case, which Dequenne failed to deny. He only said: "We'll see" . . . "I don't know" . . . "Yea, to think of a brother Moose having a recording of me".

We have detailed some of the more significant evidence because of the vigorous attack by appellants upon its sufficiency. Except as to Fiori's conviction on bill No. 213 (bribery of Mullen), it is argued that the court below should have granted all of the motions in arrest of judgment. See the Act of June 15, 1951, P. L. 585, 19 PS §871. Ricci contends that Mullen's testimony as to the meeting with Dequenne during the week of October 14, and as to the meeting with Fiori on October 24, was not received as evidence against him, with the consequence that the only date on which testimony was admitted relative to his alleged participation in the bribery and conspiracy was October 31. Ricci and Dequenne contend that the evidence consisted solely of admissions or confessions which, without proof of the corpus delicti, were inadmissible. Fiori takes the same position, except as to bill No. 213. It is settled law that a confession

may not be considered by the jury unless the corpus delicti has been proven: *Commonwealth v. Winter,* 174 Pa. Superior Ct. 35, 98 A. 2d 221. However, as pointed out by President Judge KELLER, the definition of corpus delicti includes only (1) the occurrence of the specific *kind* of injury charged, and (2) *somebody's* criminality as the source of the injury. Proof of the accused's agency as the *doer* of the crime, while an essential requisite in order to convict, does not form part of the corpus delicti: *Commonwealth v. Chuing,* 150 Pa. Superior Ct. 445, 28 A. 2d 710. Like any other fact, the corpus delicti may be proved by circumstantial evidence. All that the law requires is that it be proved beyond a reasonable doubt, and that doubt is for the jury: *Commonwealth v. Dolph,* 164 Pa. Superior Ct. 415, 65 A. 2d 253. In the case at bar, there were sufficient circumstances from which the jury could find that bribes were given and received. Ricci's conversation with Mullen on October 31, was therefore competent evidence. The same is true of Dequenne's conversation with Mullen during the week of October 14, and of Fiori's conversation with Mullen on October 24, in which payments to Ricci and Dequenne were acknowledged.

Ricci and Dequenne next contend that there was no proof of conspiracy by independent evidence, wherefore the declarations of the alleged conspirators were incompetent. The offense of conspiracy is complete the moment the parties agree to do an unlawful thing: *Commonwealth v. Kelson,* 134 Pa. Superior Ct. 132, 3 A. 2d 933, but their confederation need not be formally proved: *Commonwealth v. Ott,* 154 Pa. Superior Ct. 647, 36 A. 2d 838. A conspiracy may be, and usually is, established inferentially by showing the relation, conduct or circumstances of the parties: *Commonwealth v. Smith,* 151 Pa. Superior Ct. 113, 30 A.

2d 339. The surrounding facts in the case at bar were sufficient to warrant a finding by the jury that a conspiracy existed between Ricci and Dequenne, in which Fiori participated. Consequently, the declarations, admissions and activities of each of the appellants were admissible against the other: *Commonwealth v. Rhey*, 140 Pa. Superior Ct. 340, 14 A. 2d 192. We are not in accord with the contention that the charge of conspiracy cannot be sustained because the offense of bribery involves concerted action. The conspiracy charge in the case at bar was not against the giver of a bribe and the receiver thereof, but against two receivers, either of whom might have acted independently and without participation by the other.

All three appellants contend that the verdicts were against the weight of the evidence, against the law, and against the charge of the court. The real issue was that of credibility between Mullen and other prosecution witnesses on the one part and appellants and their witnesses on the other. This was a question for the jurors, and they resolved it against appellants. It must be borne in mind that on appeal the evidence must be considered in the light most favorable to the Commonwealth: *Commonwealth v. Stroik*, 175 Pa. Superior Ct. 10, 102 A. 2d 239. And see *Commonwealth v. Lowry*, 374 Pa. 594, 98 A. 2d 733. It is argued that the trial judge instructed the jury that the date of the offenses was October 24, 1951, but that there is no testimony in the record to sustain a finding that either Ricci or Dequenne had received a bribe on that date. This argument is apparently based on the initial recital by the trial judge of the contents of the several indictments. Subsequently, and throughout the charge, the jury was instructed that it was necessary to find that the acts occurred *on or about* October 24, 1951. We do not believe that the jury was

misled by the charge in its entirety. See *Commonwealth v. Malone*, 354 Pa. 180, 47 A. 2d 445. It is not necessary, except where time enters into the nature of the offense, to prove the exact time alleged in the indictment. Any other time may be shown on the trial, if it is prior to the finding of the indictment and within the period prescribed by the statute of limitations: *Commonwealth v. Polin*, 140 Pa. Superior Ct. 18, 12 A. 2d 798.

It is also contended that the testimony of Vitori and Runatz was contradiction of Dequenne on a collateral matter. The situation here is entirely different from that in *Commonwealth v. Truitt*, 369 Pa. 72, 85 A. 2d 425, which is the authority upon which counsel principally rely. In the *Truitt* case, the witness was questioned concerning his membership in a certain political party, a matter which the Supreme Court said was collateral to the prosecution and without probative or relevant value. In rebuttal, testimony was offered to attack the credibility of the witness, who had denied affiliation with the party. In the case at bar, Dequenne denied that Vitori and Runatz had discussed the bribery, one of the charges under consideration. Where there are two or more actors involved in a crime, considerable discretion is given to the trial judge as to the order and admissibility of the evidence: *Commonwealth v. Hendrie*, 97 Pa. Superior Ct. 328. In any event, the testimony of Vitori and Runatz was relevant on the theory of an implied admission by Dequenne. The fact that it was received in rebuttal rather than in chief did not constitute reversible error: *Commonwealth v. Hradesky*, 170 Pa. Superior Ct. 24, 84 A. 2d 393.

Finally, it is contended on behalf of Fiori "that many errors, if taken singly, would not be reversible", but the cumulative effect thereof was prejudicial. We

have considered each of the purported errors and find no merit in the argument. Counsel stresses in particular the attempts to obtain tape recordings, and that one of them was played in the presence of the jury. No objection was made at the time. However, the trial judge could hear very little of the recording. It is doubtful if the jurors heard as much. After listening to the tape a second time in chambers, and also hearing the other tape sought to be introduced by the Commonwealth, the trial judge refused to admit either on the ground that they were not sufficiently intelligible. The jurors were directed to exclude the playing of the first tape from their consideration. The substance of the conversation alleged to be on the tape had already been testified to by Mullen. Under the circumstances it would not appear that there was any undue prejudice.

After a thorough review of the entire record and the charge of the trial judge, upon which defense counsel commented favorably,[2] we are in accord with the following statement from the well considered opinion of Judge DANNEHOWER for the court below: "In conclusion, let us say, that we have reviewed this case and the record with care, and are unanimously convinced that each of these defendants, represented by able and experienced counsel, received a fair trial by an impartial and intelligent jury free from prejudicial or fundamental error. The evidence warranted and justified a conviction, and we can find no legal reason to disturb the verdicts of guilty in these offenses which strike at the very foundation of good local government".

---

[2] "As far as the defense is concerned, it's perfectly satisfied with the charge of the Court. We consider it fair and just and we don't want an exception".

The judgments of the lower court are affirmed, and it is ordered that appellants appear in the court below at such time as they may be there called and that they be by the court committed until they have severally complied with their sentences, or any part thereof which had not been performed at the time these appeals were made a supersedeas.