Commonwealth *v.* Mitchell, Appellant.

Argued March 20, 1956. Before Hirt, Gunther, Wright, Woodside, Ervin, and Carr, JJ. (Rhodes, P. J., absent).

*W. L. Kimmel*, with him *Leland W. Walker* and *Walker & Kimmel*, for appellant.

*Frank A. Orban, Jr.*, District Attorney, for appellee.

Opinion by Ervin, J., July 17, 1956:

This is an appeal by Edgar Eugene Mitchell after his conviction by a jury on two indictments, one charg-

ing pointing and discharging deadly weapons and the other assault and battery, aggravated assault and battery, and assault with intent to kill, both indictments having been consolidated for the purposes of trial. Defendant's demurrer to the evidence was overruled by the trial judge. Following verdicts of guilty, motions in arrest of judgment under the Act of June 15, 1951, P. L. 585, 19 PS §871, and for a new trial were refused. On the charge of pointing and discharging deadly weapons defendant was sentenced to pay the costs of prosecution and further sentence was suspended for a period of eighteen months during which time he was placed on probation. On the charges of assault and battery, aggravated assault and battery and assault with intent to kill defendant was sentenced to pay the costs of prosecution and to undergo imprisonment in the Allegheny County workhouse for twelve months. This appeal followed.

The only question on this appeal is whether the evidence is sufficient to support the verdict. However, "It must be borne in mind that on appeal the evidence must be considered in the light most favorable to the Commonwealth", *Com. v. Ricci*, 177 Pa. Superior Ct. 556, 564, 112 A. 2d 656.

There is little conflict in the testimony of the Commonwealth's witnesses and that of the defendant and his witnesses concerning the events culminating in the shooting of James Miller on the night of August 3, 1955 on the property of the defendant located in Listonburg, Addison Township, Somerset County. James Miller and his wife had been living at the home of the defendant, a cousin of James Miller, for approximately three or four weeks prior to August 3rd. In the afternoon of that day Miller and the defendant had gone to pick berries. They met another cousin of Miller's

named Richard Groff and, abandoning berry picking, the three men visited several taverns where they all drank beer. They eventually arrived at the home of the defendant's father where an altercation ensued between Miller and the defendant over the failure of the latter's car to operate properly. Miller admitted he challenged the defendant to a fight and when he reached into the car to grab the defendant he was struck by a small claw hammer. Defendant's father called the police but Miller and his cousin Groff left and headed for defendant's home on foot. When Miller arrived at the defendant's home he testified he found the defendant already there sitting in a chair inside the front screen door with a rifle in his hands. Though Miller testified that defendant threatened to shoot him he went inside the house and when he asked the defendant for the rifle Mitchell "released it right away." Miller then retaliated for the threats Mitchell had made by holding him at bay, pointing the gun at the defendant, arguing with him, threatening him, and demanding that he, Miller, and his wife, be driven to their home in Duquesne, Pa. Sometime later the defendant escaped by a ruse and fled from his home, ran into a neighbor's house and, fleeing through the back door continued on into the woods in the rear of the properties. Miller, in pursuit with the loaded rifle, went to the top of a slate dump nearby but, unable to see the defendant, returned to defendant's home and proceeded to shoot at the right rear tire of defendant's car causing a puncture, then proceeded to smash a front window of the car. After thus disabling the car Miller went up to the dump again and sat there in wait for the defendant until it began to get dark when he returned and sat on the front porch of the defendant's home armed with the rifle. In the meantime, after de-

fendant fled his home, the testimony of Commonwealth witness A. R. Humbert, a constable of the Borough of Confluence, disclosed that Mitchell had gone to the constable's home and sought to have the constable arrest Miller. After being informed that it was necessary to obtain a warrant defendant went to the borough building and tried to obtain a warrant from Tom Courtney, a justice of the peace. Despite his plea that Miller was causing trouble at his home with a rifle, that he had some trouble with Miller and "wanted some law" the defendant was unsuccessful in getting any cooperation and he did not obtain a warrant. As Humbert testified concerning the conversation between defendant and the justice of the peace, " . . . they didn't seem to get together, I don't know why". Defendant then obtained an old double barrelled shotgun and some shells at his father's house and returned to the vicinity of his own home where his wife informed him that Miller was still armed and waiting for him to return. Just as the defendant was approaching his house Miller saw him though it was after nine o'clock and quite dark outside. Miller testified: ". . . I said 'Chick, I want to talk to you', he started to run and I started to run after him." Miller had the gun and flashlight at the time. Defendant did start to run and he testified he fired one shot just to frighten Miller. Miller testified that he then loaded the rifle he was carrying and turned the flashlight on as he went in pursuit of the defendant. The defendant testified that when he saw Miller "had the lights on me and the gun, I just up and shot before he shot me." When asked: "Why did you fire the gun at that time?" defendant replied: "It was either him or me." Not knowing his shot had struck Miller the defendant then proceeded to seek the help of another justice of the peace in Ursina and

again requested a warrant for Miller's arrest. He was told by the justice of the peace to return in the morning and a warrant would then be issued. Upon returning to the vicinity of his home defendant learned that Miller had been shot. Frightened, he and his wife slept in the woods that night and in the morning he went to his father's home and awaited the arrival of the State Police.

At the trial the defendant set up the plea of self-defense. In determining whether the evidence was sufficient to substantiate his claim that he shot Miller in self-defense we must consider the extent of defendant's obligation to retreat under the circumstances here involved.

"The doctrine of retreat as developed in homicide cases is not by the weight of authority regarded as applicable to cases involving a mere battery, especially where immediate action appears to be necessary for self-protection." 5 C.J., Assault and Battery, §236; 6 C.J.S., Assault and Battery, §92c.

Also, "The ancient doctrine which makes it the duty of a person assaulted to 'retreat to the wall' before he is justified in repelling force by force has been generally modified in the United States. The rule now generally accepted is that one who is assailed may meet force with force without retreating, so long as he uses only such force as is necessary, even though he might with absolute safety avoid the threatened injury or bodily harm by retreating." 4 Am. Jur., Assault and Battery, §47.

And in *Beard v. United States*, 158 U.S. 550, 15 S. Ct. 962, 39 L. Ed. 1086, it was held that a man assailed on his own grounds, without provocation, by a person armed with a deadly weapon and apparently seeking his life, is not obliged to retreat, but may stand

his ground and defend himself with such means as are within his control; and so long as there is no intent on his part to kill his antagonist, and no purpose of doing anything beyond what is necessary to save his own life, is not guilty of murder or manslaughter if death results to his antagonist from a blow given him under such circumstances.

In *State v. Goldberg,* 12 N. J. Super. 293, 79 A. 2d 702, it was stated: "However, from the distant past it has been the law that a man who is assailed in his own dwelling is not under any obligation to retreat. More than 250 years ago it was said by Lord Chief Justice Hale that in case a man 'is assailed in his own house, he need not flee as far as he can, as in other cases of se defendendo, for he hath the protection of his house to excuse him from flying, as that would be to give up the protection of his house to his adversary by flight.' 1 Hale's Pleas of the Crown 486." Moreover, the rule that a man who is assailed in his own dwelling is not under any obligation to retreat has been extended to embrace one's office or place of business and prevails notwithstanding the attack proceeds from some other occupant of the house, office or place of business. *State v. Goldberg,* supra.

In the instant case we are all convinced the shooting of Miller by the defendant was clearly done in self-defense. The defendant had been forced to flee from his own home after being held a virtual prisoner by Miller at the point of a gun. He had sought to have a warrant issued for the arrest of Miller but had been unsuccessful in his efforts. Returning to the vicinity of his home after dark he was informed by his wife that Miller was awaiting his return armed with a rifle and in possession of a flashlight. When his presence on his own property was discovered Miller pursued him

and, being apprehensive for his safety and in real fear, defendant began to run away. Caught in the beam of the flashlight and seeing the gun held by Miller, the defendant, feeling further retreat was impossible, fired the shot which struck Miller. In our view defendant had clearly fulfilled any obligation he may have had to retreat in the face of pursuit by an armed aggressor and the evidence clearly sustains his contention he acted in self-defense. Pertinent and applicable here is the statement of GAWTHROP, J. in *Com. v. Sacco,* 98 Pa. Superior Ct. 347, 351: "One who is assaulted in such a way as to induce in him a reasonable and well grounded belief that he is actually in danger of losing his life, or of receiving great bodily harm, under the influence of such apprehension, will be justified in defending himself, whether the danger was real or only apparent; and though he be mistaken in his reasonable conviction he will not be held criminally liable. . . ."

Judgments of sentence are reversed and the defendant is hereby ordered discharged.